EXHIBIT B

Case 1:18-cr-00308-CBA Document 321 Filed 02/04/19 Page 2 of 32 PageID #: 1148

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------x
UNITED STATES OF AMERICA,

    -against-

JUNNY TORICES MALDONADO,

               Defendant.
-----------------------------------------------------x

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★  FEB 11 2019  ★

**BROOKLYN OFFICE**

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
18-CR-308 (CBA)

**AMON, United States District Judge:**

    Defendant Junny Torices Maldonado was deported from the United States in 2005 after being charged with robbery and weapons-related offenses, pleading guilty to attempted robbery in the second degree, and being re-sentenced to a ten-month term of imprisonment for violating the terms of his probation. Sometime prior to April of 2018, Maldonado returned to the United States illegally. He was again arrested that April, this time for forgery in the first degree and a motor vehicle violation. In June, he was charged by indictment with illegally reentering the United States in violation of 8 U.S.C. §§ 1326(a) and (b)(1). (D.E. # 15.) Maldonado now seeks to have that indictment dismissed on the ground that his fourteen-year-old deportation order was "fundamentally unfair." See 8 U.S.C. § 1326(d)(3); United States v. Mendoza-Lopez, 481 U.S. 828 (1987). For the reasons stated below, Maldonado's motion is denied.

## BACKGROUND

    Maldonado was born in Mexico in 1981. He crossed the border illegally and moved to New York to live with his relatives sometime around February 2001. (D.E. # 32 ("Def. Br.") at 4; D.E. # 35 ("Gov. Br.") at 4.) On October 13, 2002, Maldonado was arrested in Brooklyn, New York and charged with robbery and weapons-related offenses. (Gov. Br. at 4.) On February 2, 2004, he pleaded guilty to attempted robbery in the second degree, New York Penal Law § 110-

160.15(01). (Id.) He was subsequently sentenced to five years' probation but was re-sentenced to ten months' imprisonment in June 2004 for violating the terms of his probation. (Id.)

On December 28, 2004, the Department of Homeland Security (DHS) charged Maldonado in a Notice to Appear as being subject to removal. (D.E. # 32-2 ("Notice to Appear").) Written in English (not Maldonado's native Spanish), the Notice charged that Maldonado was a native of Mexico, that he entered the United States by means other than those designated by the Attorney General, and that he was convicted of a crime. (Notice to Appear at 3.) The Notice further charged that he was "subject to removal" under §§ 212(a)(6)(A)(i) and 212(a)(2)(A)(i)(I) of the Immigration and Nationality Act because he entered the country illegally and committed a "crime involving moral turpitude." (Id.) The Notice to Appear informed Maldonado of several rights that he had, such as the right to counsel,[1] the right to present witnesses and documents at a hearing, the opportunity to admit or deny the allegations against him, and the right to appeal any adverse decision arising out of the hearing. (Id. at 2.) The Notice also informed Maldonado:

> You will be advised by the immigration judge before whom you appear, of any relief from removal for which you may appear eligible including the privilege of departing voluntarily. You will be given a reasonable opportunity to make any such application to the immigration judge.

(Id.) Where the Notice provided a place for the "Date" and "Time" of the hearing, DHS wrote "a date to be set" and "a time to be set." (Id. at 1.) Maldonado signed the form indicating that it was served on him on December 30, 2004, but he did not request an expedited hearing. (Id. at 3.)

On the same date, Maldonado was presented with a Stipulated Request for Removal Order and Waiver of Hearing Form pursuant to 8 U.S.C. § 1229a(d) and 8 C.F.R. § 1003.25(b). (D.E. # 32-3 ("Stipulated Request").) The stipulated removal procedures provided for in that statute and

---

[1] A list of attorneys who "may [have been] available to represent [Maldonado] at no cost" was provided. (Notice to Appear at 2.)

2

regulation allow individuals charged as being subject to removal to "opt[] for speedy deportation in lieu of the long-shot chance of obtaining discretionary relief from removal after a protracted legal battle." United States v. Soto-Mateo, 799 F.3d 117, 123 (1st Cir. 2015). The document was written in both English and Spanish, and an immigration officer certified that Maldonado could read it by asking him to read aloud multiple paragraphs. (Stipulated Request at 8.)

Maldonado filled out the Stipulated Request Form. He wrote his name on a line reading "I, _____, understand that I am in proceedings to determine if I am removable from the United States." (Stipulated Request at 4.) He initialed next to sentences indicating that he was at least eighteen years old and that he had read or had read to him a copy of the Notice to Appear. (Id.) He then initialed next to a number of provisions explaining the consequences of applying for Stipulated Removal. For example, Maldonado indicated that he "understood" that he would be "surrendering" several "rights and privileges" including "[t]he right to be represented by a lawyer" and "[t]he right to a hearing before an Immigration Judge." (Id. at 4–5.) Important to this motion, Maldonado initialed that he understood that he was giving up:

> (iv) The right to apply for any and all relief from removal for which I might be eligible under the Immigration and Nationality Act or any other provision of law. I understand that, if I wish to request any relief from removal, I should request a hearing before an Immigration Judge. Such relief may include, but is not limited to, voluntary departure, asylum, withholding or [sic] removal, relief under Article 3 of the Convention Against Torture, adjustment of status, change of status, suspension or cancellation of removal, registry, and any waivers of removability. I do not want to apply for any relief from removal for which I may be eligible.

(Id. at 5.) He also initiated by the lines: "I admit that all of the factual allegations contained in the NTA are true and correct. I also agree that I am inadmissible or deportable and will be removed from the United States based on the charge(s) on the NTA" and "I waive my right to appeal the written order of the Immigration Judge." (Id. at 6.)

Maldonado twice indicated that his Stipulated Request was knowing and voluntary. Following the list of rights Maldonado agreed to waive, he initialed next to a provision which read:

> Knowing and understanding the above rights and privileges, I waive and abandon them and request that my removal proceedings be held without a hearing before an Immigration Judge and that the Immigration Judge issue an order based solely on the written record which will include this stipulation.

(Id. at 5.) At the end of the Stipulated Request, Maldonado again initialed that: "I have read this entire stipulation. I fully understand its consequences. I submit this request for removal voluntarily, knowingly and intelligently. I realize that by signing this stipulation, I will be removed from the United States." (Id. at 7.) In a declaration filed fourteen years later, Maldonado now states:

> I remember seeing documents and talking to the immigration officer. He spoke some Spanish. I remember telling him I wanted a hearing but he told me I was going to be deported and that if I wanted a hearing it would take a long time and I would be custody while I waited. I signed the documents because he said it would go faster if I signed the papers. I did not understand what I was signing. I did not understand what was meant by voluntary departure or asylum. I thought if I did not sign I could remain in custody for an indefinite length of time.

(D.E. # 32-6 ("Maldonado Decl.") at 2.)

On January 7, 2005, an Immigration Judge entered an order of removal on the basis of Maldonado's Stipulated Request. (Stipulated Request at 1.) The order stated:

> The respondent has submitted a written statement wherein he/she waives a personal hearing before the Immigration Judge, admits the truthfulness of the allegations contained in the Notice to Appear (NTA) and concedes removability as charged in the NTA. The respondent has made no application for relief from removal proceedings which would allow him/her to remain in the United States, but instead requests issuance of an order by this Court for his/her removal to the country of Mexico. . . . The respondent's signed request constitutes a conclusive determination of the alien's removability from the United States. Based upon the respondent's admissions and concessions, removability has been established. Appeal has been waived by both parties.

4

(Id.)  While the order indicated that the Immigration Judge had reviewed the paperwork and found that Maldonado waived a hearing, it did not contain a specific finding by the Immigration Judge that the waiver was knowing and voluntary.  Maldonado was removed on January 18, 2005.  (Gov. Br. at 7.)

On April 26, 2018, Maldonado was arrested in New York for forgery in the first degree and a motor vehicle violation.  (Id. at 7–8.)  On June 18, 2018, he was charged with illegal reentry in violation of 8 U.S.C. §§ 1326(a) and (b)(1).  Before the Court is Maldonado's motion to dismiss that indictment on the ground that the deportation proceedings that serve as the predicate for his unlawful entry charge were "fundamentally unfair."

## STANDARD OF REVIEW

Maldonado seeks dismissal of his indictment on the ground that his 2005 deportation order cannot serve as a predicate for an illegal reentry prosecution.  8 U.S.C. § 1326(d) allows a defendant to collaterally attack "the validity of [a] deportation order" only when the defendant can establish three preconditions:

> (1) The alien exhausted any administrative remedies that may have been available to seek relief against the order;
>
> (2) The deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and
>
> (3) The entry of the order was fundamentally unfair.

To establish the third precondition, a defendant "must show both a fundamental procedural error and prejudice resulting from that error."  United States v. Fernandez-Antonia, 278 F.3d 150, 159 (2d Cir. 2002).  "In order to show prejudice," a defendant "must show that, absent the procedural errors, he would not have been removed."  Id.; see also United States v. Copeland, 376 F.3d 61, 73 (2d Cir. 2004) ("[P]rejudice is shown where 'there is a reasonable probability that, but for [the]

errors, the result of the proceeding would have been different.'" (quoting <u>Strickland v.</u> <u>Washington</u>, 466 U.S. 668, 694 (1984)).

## DISCUSSION

Maldonado argues that there were "three points of error in the underlying deportation proceeding" which rendered the proceeding fundamentally unfair. (Def. Br. at 7.) First, Maldonado maintains that "the failure of the immigration judge to find that Mr. Maldonado had knowingly and intelligently waived his right to a removal hearing" was fundamentally unfair. (<u>Id.</u>) "The second point of error in the underlying deportation proceeding was the failure of an IJ to inform Mr. Maldonado of relief eligibility"—namely, that Maldonado could apply for voluntary departure, asylum, relief under the Convention Against Torture, and withholding of removal. (<u>Id.</u> at 9; D.E. # 46.) Third, Maldonado alleges that "the lack of translation much less knowing and voluntary waiver of an appeal from the IJ's ruling," was error. (Def. Br. at 11.) Maldonado acknowledges that he did not exhaust his administrative remedies or apply for judicial review of the Immigration Judge's deportation order, but he argues that his failures are excused because his waiver of these rights was not knowing and voluntary. (<u>Id.</u> at 11–12 (citing <u>United States v. Sosa</u>, 387 F.3d 131, 136 (2d Cir. 2004), and <u>Copeland</u>, 376 F.3d at 68 n.6).) Separate from his arguments about the fundamental unfairness of the deportation proceeding, Maldonado contends that the Immigration Judge lacked jurisdiction to enter a deportation order against him because his Notice to Appear did not set a time or date for his hearing and that, as such, the order is null and void. (<u>Id.</u> at 13–17.) Maldonado does not argue that the Stipulated Removal procedure through which he was removed is itself violative of due process. (D.E. # 49 at 38:5–7 ("Mind you, we're not making a constitutional claim with respect to – that's in general rather than as applied here . . .")).

For the reasons that follow, the Court concludes that the underlying deportation proceeding was not fundamentally unfair and that the Immigration Judge had jurisdiction to enter Maldonado's deportation order.

## I. Fundamental Unfairness

As noted above, in order to establish "fundamental unfairness," Maldonado "must show both a fundamental procedural error and prejudice resulting from that error." Fernandez-Antonia, 278 F.3d at 159. The Court addresses each alleged "fundamental procedural error" in turn.

### A. *Lack of Knowing and Voluntary Waiver of Hearing*

Taking Maldonado's last argument first, Maldonado claims there was a "lack of translation much less knowing and voluntary waiver of an appeal from the IJ's ruling." (Def. Br. at 11.) On his Stipulated Request Form, Maldonado initialed next to a Spanish translation reading: "I understand and agree to accept a written order for my removal as final disposition of these proceedings. I waive my right to appeal the written order of the Immigration Judge." (Stipulated Request at 6.) Further, Maldonado initialed next to a portion of the Stipulated Request Form, written in Spanish, which read "I have received and I have read or had read to me a copy of the Notice to Appear (NTA) . . ." (Stipulated Request at 4.) The Court interprets Maldonado's argument—not developed beyond the single sentence written above—to be that his appeal waiver in his Stipulated Request was not knowing and voluntary. "Obtaining an invalid waiver of the right to appeal a deportation order violates due process." United States v. Gomez, 757 F.3d 885, 893 (9th Cir. 2014).

The Court concludes that Maldonado has failed to show that his waiver of his right to appeal was not knowing and voluntary. Where a defendant has signed a waiver of his rights to a hearing and to appeal, the burden is on the defendant to show that his waiver was not knowing and

voluntary. See Soto-Mateo, 799 F.3d at 121 ("[W]here, as here, the government produces a written and signed waiver of rights—the defendant must carry the burden of showing that the waiver was infirm."); Richardson v. United States, 558 F.3d 216, 222 (3d Cir. 2009) (same); but see United States v. Ramos, 623 F.3d 672, 680 (9th Cir. 2010) ("The government bears the burden of proving valid waiver in a collateral attack of the underlying removal proceedings."). This allocation of the burden of proof is supported by the plain text of the statute, which states that an alien may challenge the validity of his underlying deportation order only if "the alien demonstrates" certain enumerated showings. 8 U.S.C. § 1326(d).

Here, Maldonado was presented with the Stipulated Request Form in both English and his native Spanish. Maldonado acknowledged that he read the form, specifically initialing that he "underst[oo]d" that he was "surrendering . . . [t]he right to a hearing before an Immigration Judge"; that "[k]nowing and understanding" his rights, he "waive[d] and abandon[ed] them and request[ed] that [his] removal proceedings be held without a hearing"; that he "waive[d] [his] right to appeal the written order of the Immigration Judge"; that he "underst[oo]d this entire stipulation"; and that he "submit[ted] this request for removal voluntarily, knowingly and intelligently." (Stipulated Request at 4–7.) Given this waiver, the burden is on Maldonado to show that it was not knowing and voluntary.

As evidence that this waiver was unknowing, Maldonado has offered only a single paragraph in a declaration prepared for this motion stating, in substance, "I signed the documents because [the immigration officer] said it would go faster if I signed the papers. I did not understand what I was signing." (Maldonado Decl. at 2.) The Court finds that this statement is insufficient to meet Maldonado's burden of showing that his waiver was unknowing and involuntary. On

similar records, several circuit courts have affirmed district court findings that Stipulated Request

waivers were knowing and voluntary. In Soto-Mateo, for instance, the First Circuit concluded:

> The appellant has not come close to carrying this burden. He was expressly informed, in writing and in a language he understands, about his right to appeal; and he unequivocally relinquished that right by signing the Stipulation. By the same token, he freely accepted the proposition that the IJ's decision would be "a final disposition of the[] removal proceedings." He does not claim illiteracy, nor does he limn any plausible basis for believing that he was pressured into surrendering his rights. To the precise contrary, his unsolicited letter to the immigration officer attests to his eagerness to "speed up the process" and be deported as quickly as possible. On this record, then, the district court had ample support for its conclusion that the appellant's written waiver of the right to appeal his removal order was knowing and intelligent.

799 F.3d at 121. Similarly, the Seventh Circuit in United States v. Baptist, 759 F.3d 690, 696–97

(7th Cir. 2014), held:

> Baptist's failure to read the form is insufficient to prove his waiver invalid. It is uncontested that Baptist could read and understand the form before him, since the form was in English, his native language. It is also undisputed that the form explained Baptist's rights, including his right to counsel, to a hearing, and to appeal, as well as the fact that he was choosing to waive those rights. The bottom of the form expressly stated that defendant had read and understood the form as well as the rights he was waiving, and Baptist signed the form. Though Baptist contends that he was told to "hurry up and sign [the form] if he wanted to go back to Belize," he never asserts that anyone tricked or pressured him into signing the form; instead, he argues that he should have been represented by counsel or had the form orally explained to him before his waiver could be considered knowing and voluntary.

Finally, the Tenth Circuit held in United States v. Tamayo–Baez, 820 F.3d 308, 313–314 (10th Cir.

2016):

> Although Tamayo–Baez now claims he did not understand the documents he signed, he testified that he did not sign documents without understanding them. Despite arguing after the fact that he was confused while signing the documents, Tamayo–Baez conceded he did not ask the immigration officers any questions or inform them that he was confused while signing the documents. While Tamayo–Baez claimed immigration officers only read his rights to him in English, an immigration officer signed and dated the Notice to Appear and Notice of Rights forms indicating he read the forms to Tamayo–Baez in Spanish. The Stipulation for Removal, which was written in English and Spanish and filled out by Tamayo–Baez in Spanish and English, stated that Tamayo–Baez read and fully understood

9

the form and that his decision to stipulate was voluntarily, knowingly, and intelligently made. Therefore, Tamayo–Baez was adequately advised of his rights in Spanish [and] his waiver of his right to appeal was valid.

As in Soto-Mateo, Baptist, and Tamayo-Baez, Maldonado was provided with all the information he needed—in his native Spanish—to make a knowing and voluntary waiver of his right to appeal and his right to a hearing. He "does not claim illiteracy, nor does he limn any plausible basis for believing that he was pressured into surrendering his rights." Soto-Mateo, 799 F.3d at 121. Maldonado claims that he "did not understand what [he] was signing," (Maldonado Decl. at 2), but he does not explain why he did not. The Stipulated Request form was written in plain language in Spanish, which Maldonado can read and understand. Maldonado's only suggestion of impropriety on the part of the immigration officials is that he was allegedly told that if he "wanted a hearing it would take a long time and [he] would be custody while [he] waited." (Maldonado Decl. at 2.) But as in Baptist, a suggestion that signing a Stipulated Request will speed up the process is not the same as being "tricked or pressured . . . into signing the form." 759 F.3d at 696.

Maldonado made a choice to expedite his removal proceedings and his regret in 2019 is not tantamount to involuntariness in 2004. This is not a case like the en masse proceedings that the Ninth Circuit found insufficient to demonstrate the validity of a waiver in United States v. Gomez, 757 F.3d 885, 890 (9th Cir. 2014).[2] Maldonado signed a waiver of his right to a hearing and his right to appeal after an immigration official verified that he could understand the waiver presented to him. He cannot escape prosecution for illegal reentry by making a bald assertion

---

[2] As noted above, the Ninth Circuit also allocates the burden of proving a valid waiver on the Government, a position the First Circuit has described as "a minority view and untenable." Soto-Mateo, 799 F.3d at 122 & n.5.

directly contradicting his representations in that waiver in an affidavit produced fourteen years later, after his subsequent arrest.

### B. Violation of 8 C.F.R. § 1003.25(b)

Maldonado's next contention is that the Immigration Judge failed to make an explicit finding that his waiver of his right to a hearing was knowing and voluntary and that this failure violated 8 C.F.R. § 1003.25(b)'s requirement that, "[i]f the alien is unrepresented, the Immigration Judge must determine that the alien's waiver is voluntary, knowing, and intelligent." (Def. Br. at 7–8.) This is distinct from the question whether his waiver was in fact knowing and voluntary. Instead, Maldonado asks the Court to conclude that the Immigration Judge erred procedurally. Even assuming arguendo that the Immigration Judge did violate 8 C.F.R. § 1003.25(b), the Court finds that violation of that regulation—in the context presented here—is not actionable under 8 U.S.C. § 1326(d) on collateral review because it is not a "fundamental procedural error" and that, even if it were, Maldonado was not prejudiced in this case.

### 1. Fundamental Procedural Error

Even if the Immigration Judge had committed a regulatory violation, it would not provide grounds to collaterally attack Maldonado's deportation order under 8 U.S.C. § 1326(d). The Fifth Circuit has held that the failure of an Immigration Judge to make "a separate finding . . . that [a] pro se alien's waiver is knowing and voluntary" does not rise to the level of a fundamental procedural error. See United States v. Cordova-Soto, 804 F.3d 714, 722 (5th Cir. 2015). That Court reasoned that the "failure of an agency to follow its own regulations is not . . . a per se denial of due process unless the regulation is required by the constitution or a statute." Id. at 721 (quoting Arzanipour v. INS, 866 F.2d 743, 746 (5th Cir. 1989)). It concluded "that due process does not require a separate finding by an IJ that the pro se alien's waiver is knowing and voluntary." Id. at 721–22.

11

In contrast, the Ninth Circuit has held that violation of 8 C.F.R. §1003.25(b) can serve as the basis for collaterally invalidating an underlying removal order. See Ramos, 623 F.3d at 683. That Court employs a test with regard to regulatory violations which considers, first, "whether the regulation itself serves a purpose of benefit to the alien," and second, whether "the violation prejudiced the interests of the alien which were protected by the regulation." Id. at 683 (internal alterations omitted). The Ramos Court concluded that 8 C.F.R. § 1003.25(b) had been violated and that "Ramos's waiver of rights . . . was not knowing and voluntary." Id. However, it declined to dismiss Ramos's indictment under 8 U.S.C. § 1326(d) because Ramos failed to establish entitlement to relief from deportation. Id. at 683–84. The Second Circuit has yet to address the issue, but a district court in this Circuit has held that failure to abide by § 1003.25(b) is a fundamental procedural error. See United States v. Nunez, 17-CR-493 (PKC), D.E. # 23, at 9–16 (E.D.N.Y. July 12, 2018).

In the Second Circuit, deportation proceedings are fundamentally unfair only if error was committed "that would have entitled [the alien] to relief on direct appeal," and if that error resulted in "unfair[] prejudice[]," See United States v. Fares, 978 F.2d 52, 57 (2d Cir. 1992); see also United States v. Gill, 748 F.3d 491, 506 (2d Cir. 2014). Maldonado must therefore establish that violation of 8 C.F.R. § 1003.25(b) would have entitled him to relief on direct appeal in order to demonstrate that the Immigration Judge committed a fundamental procedural error.

On direct review, the Second Circuit employs a two-part test for determining whether a regulatory error requires remand to the immigration tribunal. The first part mirrors the test in the Fifth Circuit: "[W]hen a regulation is promulgated to protect a fundamental right derived from the Constitution or a federal statute, and the INS fails to adhere to it, the challenged deportation proceeding is invalid and a remand to the agency is required," without a showing of prejudice to

the protected right. Waldron v. INS, 17 F.3d 511, 518 (2d Cir. 1993). The second part mirrors the test in the Ninth Circuit: "On the other hand, where an INS regulation does not affect fundamental rights derived from the Constitution or a federal statute, we believe it is best to invalidate a challenged proceeding only upon a showing of prejudice to the rights sought to be protected by the subject regulation." Id. By way of example, Waldron held that a regulation entitling an alien to notice "that he may communicate with the consular or diplomatic officers of the country of his nationality" did not protect fundamental rights. Id. A regulation requiring an Immigration Judge to have an alien state on the record whether he desires counsel does protect such rights. Montilla v. INS, 926 F.2d 162, 170 (2d Cir. 1991).

The first step for this Court is to determine whether § 1003.25(b) protects a fundamental right derived from the Constitution or a federal statute. Nolasco v. Holder, 637 F.3d 159 (2d Cir. 2011), provides a helpful guide on the Second Circuit's analysis of whether a regulation protects "a fundamental right." In that case, the Department of Homeland Security served a Notice to Appear on a nine year–old child despite a regulation requiring service to be effected on the guardian of a minor, 8 C.F.R. § 103.5a(c)(2)(ii), Nolasco, 637 F.3d at 164. The Second Circuit reasoned that "the regulation is designed to increase the probability that a minor, like any adult alien, has notice of the charges filed against her and thus may appear before the immigration court and participate in the proceedings." Id. The Second Circuit then concluded that violation of this regulation did not implicate the minor's fundamental rights in the following passage:

> However, to the extent 8 C.F.R. § 103.5a(c)(2)(ii) implicates a due process right, that right is to receive notice provided for in the NTA. And where it is clear that the minor alien received such notice, she has no due process claim, regardless of any technical defect in the manner in which the NTA has been served. Put differently, if DHS fails to make proper service on a minor alien under § 103.5a(c)(2)(ii) and that defect in service prevents the minor from receiving notice of the NTA and a meaningful opportunity to participate in her removal proceedings, that could implicate the minor alien's fundamental rights. But a defect

13

in service, standing alone, does not. Here, the record is replete with proof that both Petitioner and her parents received actual notice of the contents of the NTA and were afforded a full and fair hearing before the immigration judge. There is no question, therefore, that Petitioner was afforded due process. DHS's failure to make proper service did not implicate her fundamental rights.

Id.

The Court finds Nolasco particularly instructive. 8 C.F.R. § 1003.25(b) "is designed to increase the probability" that a pro se alien does not unknowingly or involuntarily waive his statutory rights. As in Nolasco, "to the extent [8 C.F.R. § 1003.25(b)] implicates a due process right, that right is to [ensure a knowing and voluntary waiver of rights]." And, as in Nolasco, "where it is clear that the [pro se] alien [knowingly waived his rights], [he] has no due process claim, regardless of any technical defect in the manner in which the [Immigration Judge made his findings]." Because the Court has already found that Maldonado's waiver was knowing and voluntary, it is bound to conclude—as in Nolasco—that the Immigration Judge's "failure to make proper [findings] did not implicate [Maldonado's] fundamental rights."

Because any violation of 8 C.F.R. § 1003.25(b) did not implicate his fundamental rights, Maldonado must show "prejudice to the rights sought to be protected by the subject regulation." Waldron, 17 F.3d at 518. 8 C.F.R. § 1003.25(b) is designed to ensure that an alien's waiver of rights is knowing and voluntary. As discussed above, Maldonado has not met his burden to show that his waiver was not knowing and voluntary. The Court therefore concludes that any violation of 8 C.F.R. § 1003.25(b)—had one occurred—would not be a fundamental procedural error. That is because "due process does not require a separate finding by an IJ that the pro se alien's waiver is knowing and voluntary." Cordovo-Soto, 804 F.3d at 721–22; see also United States v. Jackson, 247 F. App'x 453, 455 (4th Cir. 2007) (finding district court's failure to make a determination that defendant's guilty plea was knowing and voluntary in violation of Federal Rule of Criminal

Procedure 11(b)(2) did not affect defendant's substantial rights because the record supported the conclusion that the plea was in fact knowing and voluntary).

## 2. Prejudice

Even assuming <u>arguendo</u> that the Immigration Judge did commit a fundamental procedural error, Maldonado had to show that this error prejudiced him in order to establish entitlement to dismissal of his indictment. To do so, Maldonado must show that there is a "reasonable probability" that "absent the procedural errors, he would not have been removed." <u>See</u> <u>Fernandez-Antonia</u>, 278 F.3d at 159; <u>Copeland</u>, 376 F.3d at 73. The technical procedural error discussed above is a few steps away from the ultimate question whether Maldonado "would not have been removed" but for the error. The causal chain is as follows: (1) had the Immigration Judge made a determination whether Maldonado's waiver was knowing and voluntary, the Judge would have found that it was <u>not</u> and Maldonado would have proceeded to a hearing; (2) at the hearing, Maldonado would have expressed interest in seeking an alternate disposition; and (3) Maldonado would have established entitlement to that disposition. <u>Cf.</u> <u>United States v. Gonzalez</u>, No. 15-CR-21 (JMF), 2015 WL 3443942, at *11 (S.D.N.Y. May 29, 2015) (in the context of an error committed during a deportation hearing, defendant "must demonstrate <u>both</u> a reasonable probability that he would have sought voluntary departure <u>and</u> that such relief would have been granted.") (emphasis in original); <u>United States v. Brown</u>, --- F. Supp. 3d ---, No. 18-CR-532 (AT), 2018 WL 6437061, at *6 (S.D.N.Y. Dec. 7, 2018) (same); <u>United States v. Cerna</u>, 603 F.3d 32, 41 (2d Cir. 2010) ("We have previously found that where counsel failed to file an application for relief under § 212(c), an alien can show both fundamental procedural error and prejudice by establishing that (1) a competent attorney would have filed the application, (2) the alien was prima facie eligible for § 212(c) relief, and (3) the alien could have made a strong showing in support of his application."). Maldonado must establish a "reasonable probability" that this causal chain

15

would have come to be. It is his burden to establish prejudice. <u>See</u> 8 U.S.C. § 1326(d) ("an alien may not challenge the validity of the deportation order . . . <u>unless the alien demonstrates that</u> . . .") (emphasis added). Here, Maldonado fails to establish prejudice because he cannot establish a "reasonable probability" that he would have been entitled to relief absent the error.

Regarding the first link, the Court has already concluded that Maldonado has failed to show that his waiver was not knowing and voluntary. As such, had the Immigration Judge made an explicit finding regarding the voluntariness of Maldonado's waiver, he would likely have found that it <u>was</u> knowing and voluntary and therefore that Maldonado's waiver of his right to a hearing was valid. Maldonado concedes that this finding could be made on the record before the Immigration Judge and that no further inquiry would have been required.

Further, had Maldonado proceeded to a deportation hearing, it was not reasonably probable that he would have applied for—or received—relief from deportation. Maldonado claims he was entitled to voluntary departure or asylum. (Def. Br. at 10.) In a supplemental filing, he also claims he could have proved entitlement to either withholding of removal or protection under the Convention Against Torture (CAT). (D.E. # 46.) But the record does not support these claims.

### i. Voluntary Departure

Maldonado has not established a reasonable probability that he would have received voluntary departure had he applied. Voluntary departure exists in two forms—pre-hearing voluntary departure, 8 U.S.C. § 1229c(a), and post-hearing voluntary departure, 8 U.S.C. § 1229c(b). These forms of relief are related, but have important differences. <u>See</u> <u>In re Arguelles-Campus</u>, 22 I. & N. Dec. 811, 816–17 (BIA 1999). For example, an alien seeking post-hearing voluntary departure needs to establish that they have been a "person of good moral character for at least 5 years immediately preceding the alien's application." 8 U.S.C. § 1229c(b)(1)(B). An alien seeking pre-hearing voluntary departure need not establish this precondition, but he must

"concede[] removeability", "waive[] appeal of all issues", and "make[] no additional requests for relief." 8 C.F.R. § 1240.26(b)(i)(B)–(D). If an alien establishes eligibility for either pre- or post-hearing voluntary departure, granting such relief is within the discretion of the Immigration Judge. In re Arguelles-Campos, 22 I. & N. Dec. at 817.

Maldonado's submissions to this Court show that he could not have established entitlement to pre-hearing voluntary departure. Maldonado claims entitlement to not only voluntary departure, but also withholding of removal, asylum, and CAT relief. (See Def. Br. at 10; D.E. # 46.) A precondition to pre-hearing voluntary departure is that an alien "makes no additional requests for relief." 8 C.F.R. § 1240.26(b)(i)(B). Maldonado's claim that he would have applied for pre-hearing voluntary departure is inconsistent with his claim that he was entitled to and would have sought other forms of relief.

Regarding post-hearing voluntary departure, Maldonado has not established that he was a "person of good moral character" at the time of his deportation. 8 U.S.C. § 1229c(b)(1)(A). Under 8 U.S.C. § 1101(f)(3), a person is per se not of good moral character if he is "a member of one or more of the classes of persons . . . described in . . . subparagraph[] (A) . . . of section 1182(a)(2)." Section 1182(a)(2)(A)(i) refers to "alien[s] convicted of . . . a crime involving moral turpitude." Second degree robbery—the crime for which Maldonado was convicted—is a crime of moral turpitude. (See D.E. # 49 at 10:21–22 ("[H]e was charged with a crime involving moral turpitude.")); see also Matter of De La Nues, 18 I. & N. Dec. 140, 145 (BIA 1981) ("Burglary and theft or larceny, whether grand or petty, are crimes involving moral turpitude.").

Even if Maldonado had established the preconditions that would render him eligible for either pre- or post-hearing voluntary departure, there is no reasonable probability that an Immigration Judge would have exercised his discretion to grant such relief. By Maldonado's own

submissions, voluntary departure is rare, granted in only eleven percent of cases in 2005. (Def. Br. at 10 (citing Exec. Office for Immigration Review, U.S. Dept. of Justice, FY 2009 Statistical Year Book (Mar. 2010), at Table 14).) "[M]any factors may be weighed in exercising discretion with voluntary departure applications, including the nature and underlying circumstances of the deportation ground at issue; additional violations of the immigration laws; the existence, seriousness, and recency of any criminal record; and other evidence of bad character . . . ." In re Arguelles-Campus, 22 I. & N. Dec. at 817. Maldonado's recent conviction for second-degree robbery and his subsequent re-sentencing to a ten-month incarceratory term would have been a high barrier to surmount in proving entitlement.[3]

### ii.     Asylum and Withholding of Removal

Maldonado's likelihood of establishing entitlement to asylum is even less probable. Maldonado first entered the United States around February 2001, was arrested in October 2002, and did not undergo deportation proceedings until December 2004. Maldonado therefore failed to apply for asylum "within 1 year after the date of [his] arrival in the United States," as is required by statute. 8 U.S.C. § 1158(a)(2)(B). Even if his asylum claim was not time-barred, Maldonado never expressed any fear of returning to Mexico at the time of his deportation, so it is unlikely that he would have applied for asylum if he had a hearing. (See D.E. # 35-1, at 2 ("Subject states no fear of returning to Mexico."); D.E. # 47-1, at 3 ("Q. Do you have any fear of prosecution or torture should you be removed from the United States?  A. N/C").)

---

[3] Had Maldonado been sentenced to a one-year term for his second-degree robbery conviction, he would have been statutorily ineligible for voluntary departure. 8 U.S.C. § 1229c(a)(1) (no discretion to allow voluntary departure for individuals "deportable under section 1227(a)(2)(A)(iii)"); id. § 1227(a)(2)(A)(iii) ("Any alien who is convicted of an aggravated felony at any time after admission is deportable."); id. § 1101(a)(43)(F) ("a crime of violence . . . for which the term of imprisonment [is] at least one year" is an aggravated felony); United States v. Pereira-Gomez, 903 F.3d 155, 159 (2d Cir. 2018) (second-degree robbery is a crime of violence).

Had Maldonado applied for asylum, he has not established a reasonable probability that it would have been granted. In order to qualify for asylum, "an applicant must establish that he or she meets the statutory definition of a 'refugee' . . . defined in relevant part as a person who is unable or unwilling to return to his or her native country 'because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." Yueqing Zhang v. Gonzales, 426 F.3d 540, 544 (2d Cir. 2005) (quoting 8 U.S.C. § 1101(a)(42)(A)). Maldonado claims he could have established persecution on account of "political opinion" or "membership in a particular social group," but he has not met his burden to show that he could have established such persecution. (D.E. # 46 at 6.)

Maldonado claims his refusal to join the Zetas gang would subject him to persecution on the basis of political opinion because "punishment for resisting or failing to join in [] criminality qualifies as persecution on account of political opinion" when "criminals operate with impunity from or in effective criminal connivance with the state." (D.E. # 46 at 6.) But in order for this statement to hold true, an "applicant must also show, through direct or circumstantial evidence, that the persecutor's motive to persecute arises from the applicant's political belief." Yueqing Zheng, 426 F.3d at 545. The Supreme Court has noted that "[e]ven a person who supports a guerrilla movement might resist recruitment for a variety of reasons—fear of combat, a desire to remain with one's family and friends, a desire to earn a better living in civilian life, to mention only a few." INS v. Elias-Zacarias, 502 U.S. 478, 482 (1992). Here, Maldonado has provided the following statement about his relationship to the Zetas:

> When I was a teenager, gang members tried to get me to join their association and criminal pursuits. These included drug trafficking and violent crime. The gang, ZETAS, was active in my town and school. They targeted teenaged boys. When I was around 15 or 16 they started systematically attacking me and threatening me and my family. Their purpose was to get me to join the gang. Other boys got harassed this way too and many joined to stop the attacks. I would not join and that

19

meant I was followed, beat up, and threatened with death. During one attack I was stabbed twice in the chest. Another time I was slashed with knives scarring my arms. I can show these scars at a hearing.

(Maldonado Decl. ¶ 2.) He continued: "I did not want to join the gang but did not want to continue putting my family at risk and so I set out to the United States border." (Id. ¶ 3.) Although the Court is sympathetic to the conditions Maldonado was subjected to as a teenager, he has not explained how his resistance to joining the Zetas "transcends mere self-protection and represents a challenge to the legitimacy or authority of the ruling regime," so as to constitute persecution on account of political opinion. Yueqing Zhang v. Gonzales, 426 F.3d 540, 547 (2d Cir. 2005); see also Castro v. Holder, 597 F.3d 93, 100–01 (2d Cir. 2010). "Opposition to a gang . . . may have a political dimension, but refusal to join the gang is not necessarily politically motivated." Marroquin-Ochoma v. Holder, 574 F.3d 574, 578–79 (8th Cir. 2009).

Maldonado's declaration also falls short of establishing that he had a well-founded fear of persecution on account of his membership in a particular social group. He states that the Zetas "targeted teenaged boys" for recruitment. (Maldonado Decl. ¶ 2.) In a similar context, the Board of Immigration Appeals has held that "the proposed group, which consists of young Salvadorans who have been subject to recruitment efforts by criminal gangs, but who have refused to join for personal, religious, or moral reasons, fails the 'social visibility' test and does not qualify as a particular social group." Matter of S-E-G-, 24 I. & N. Dec. 579, 588 (BIA 2008). The Second Circuit has more than once affirmed this interpretation. See, e.g., Rivas Rivas v. Sessions, 726 F. App'x 859, 861 (2d Cir. 2018) ("Rivas Rivas's proposed social group, 'young male[s] opposing gang membership in El Salvador . . . who are unable to leave MS13,' lacks both particularity and social distinction."); Oliva-Flores v. Holder, 477 F. App'x 774, 775 (2d Cir. 2012) ("Petitioners' proposed social group—young Guatemalan men who have resisted gang recruitment—lacks the

particularity and social visibility required for it to constitute a particular social group."); Vasquez v. Holder, 343 F. App'x 681, 682 (2d Cir. 2009) ("individuals who have been actively recruited by gangs, but who have refused to join because they oppose the gangs" are not a particular social group.).

For the same reasons, Maldonado has not established entitlement to withholding of removal. See Wu Biao Chen v. INS, 344 F.3d 272, 275 (2d Cir. 2003) ("an applicant who cannot establish his eligibility for asylum is necessarily unable to establish his eligibility for withholding of removal").

### iii.    Convention Against Torture

For many of the same reasons, Maldonado has not established prejudice premised on a reasonable probability that he would have received relief under the Convention Against Torture. To establish entitlement to relief under the Convention Against Torture, an individual must prove that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(3). Torture is defined as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as . . . intimidating or coercing him or her . . . when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1). In determining CAT eligibility, an immigration official considers "[e]vidence of past torture"; "[e]vidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured"; "[e]vidence of gross, flagrant or mass violations of human rights within the country of removal"; and "[o]ther relevant information regarding conditions in the country of removal." 8 C.F.R. § 208.16(c)(3)(i)–(iv). CAT relief is "subject to a higher standard of proof than asylum claims." Paul v. Gonzales, 444

F.3d 148, 155 (2d Cir. 2006). The burden of proof is on Maldonado to prove his entitlement to relief. 8 C.F.R. § 208.16(c)(2).

Here, Maldonado has failed to establish that the Zetas control so much of Mexico that he could not have escaped them by relocating elsewhere within the country. (Cf. D.E. # 47-2 at 3 (State Department's 2004 Country Report on Mexico, containing only fleeting reference that "a group known as the 'Zetas,' composed of former soldiers, was working with drug trafficking organizations").) Nor has Maldonado established that there are "gross, flagrant or mass violations of human rights within the country of removal." To the contrary, the State Department's 2004 Country Report on Mexico indicates that the "Government generally respected many of the human rights of its citizens." (D.E. # 47-2, at 2.) Although there were some reported incidents of torture in that Country Report, none were perpetrated by the Zetas, nor under conditions similar to those described by Maldonado. (Id. at 4–5.) And the articles cited by Maldonado regarding the reach of the Zetas in Mexico were published in 2010 and 2017, suggesting that they are less probative of country conditions in 2004 than the State Department Country Report. (D.E. # 46 at 6–7.)

Perhaps most important to Maldonado's CAT claim is the affidavit he swore contemporaneous to his original removal proceedings. When interviewed by immigration officials in 2018, Maldonado expressed a fear of being returned to Mexico. (D.E. # 46 at 8.) But when he was asked similar questions in 2004, he expressed no such fear. When asked "[d]o you have any fear of prosecution or torture should you be removed from the United States?" on October 14, 2004, Maldonado responded "N/C." (D.E. # 47-1 at 3) Maldonado's October 16, 2004 "Record of Deportable/Inadmissible Alien" form reflects that "[s]ubject states no fear of returning to Mexico." (D.E. # 35-1 at 3.) And Maldonado initialed next to a waiver of his right to seek "relief under Article 3 of the Convention Against Torture" on December 30, 2004. (Stipulated Request

at 5.) Maldonado's 2004 responses indicate that he would not have sought CAT relief even had he gone before an Immigration Judge in his 2005 deportation proceedings.

* * *

In sum, there is not a "reasonable probability" that Maldonado would not have been deported had the Immigration Judge satisfied his duties under 8 C.F.R § 1003.25(b). In other words, Maldonado has not met his burden to show that, had the Immigration Judge made an on-the-record finding as required by 8 C.F.R. §1003.25(b), there was a reasonable probability that (1) the Immigration Judge would have found that his waiver was not knowing and voluntary, (2) he would have applied for relief from deportation, and (3) he would have received that relief. As such, his deportation was not fundamentally unfair on this ground.

### C. Failure to Inform of Relief Eligibility

Finally, Maldonado argues that the Immigration Judge failed to inform him of his relief eligibility, as is required by 8 C.F.R. § 1240.11(a)(2). (Def. Br. at 9.) The Court determines that the Immigration Judge did not commit this alleged error.

The Second Circuit has held that failure to inform an alien of the right to apply for discretionary relief provided for under the Immigration and Nationality Act during a deportation hearing is a fundamental procedural error. See, e.g., Copeland, 376 F.3d at 71; Sosa, 387 F.3d at 138; United States v. Calderon, 391 F.3d 370, 376 (2d Cir. 2004). However, 8 C.F.R. § 1240.11(a)(2)—which provides that "[t]he immigration judge shall inform the alien of his or her apparent eligibility to apply for any of the benefits enumerated in this chapter"—applies only "[i]n conjunction with any application for creation of status of an alien lawfully admitted for permanent residence made to an immigration judge." Such an application, in turn, can only be made "[i]n a removal proceeding." Id. § 1240.11(a)(1).

23

Here, Maldonado waived his right to a removal hearing, as contemplated by 8 U.S.C. § 1229a(d) and 8 C.F.R. § 1003.25. With that waiver, Maldonado waived the rights that would have attached during the hearing. Maldonado acknowledged this when he initialed that he understood that he was giving up, "[t]he right to apply for any and all relief from removal for which [he] might be eligible under the Immigration and Nationality Act or any other provision of law" and that he "underst[oo]d that, if [he] wish[ed] to request any relief from removal, [he] should request a hearing before an Immigration Judge." (Stipulated Request at 5.) As noted above, that waiver was knowing and voluntary.

In Copeland, Sosa, and Calderon, the Second Circuit acknowledged fundamental procedural errors where Immigration Judges failed to inform aliens of their right to apply for relief from removal during the course of a removal hearing. Because the requirement that an Immigration Judge inform an alien about potential relief from removal attaches only during a deportation hearing, and because Maldonado waived his right to such a hearing and to be informed of and apply for such relief, the Immigration Judge did not commit fundamental error in his case.

## II. Administrative Exhaustion and Deprivation of Judicial Review

Had Maldonado established a fundamental procedural error and resulting prejudice, 8 U.S.C. § 1326(d)(3), he would not be entitled to relief unless he could also show that he exhausted administrative remedies, id. § 1326(d)(1), and was improperly derived of judicial review, id. § 1326(d)(2). Maldonado does not contend that he utilized his other channels of review, but instead argues that his failure to do so should be excused. (Def. Br. at 11–12.) This argument stems from an exception recognized in Sosa, 387 F.3d at 136, which held that "the exhaustion requirement must be excused where an alien's failure to exhaust results from an invalid waiver of the right to an administrative appeal." This excuse turns on whether any waiver of rights was

24

knowing and voluntary. See id. ("failure to exhaust administrative remedies bars collateral review of a deportation proceeding only where an alien's waiver of administrative review was knowing and intelligent"); Copeland, 376 F.3d at 368 n.6 ("Where a waiver of the right to appeal is not knowing, an alien is deprived of the opportunity for judicial review.").

Maldonado signed separate segments of his Stipulated Removal Request waiving both his right to an administrative hearing and his right to appeal the written order of the Immigration Judge. (Stipulated Request at 5, 6.) As noted above, Maldonado did not meet his burden to prove that his waiver was in fact not knowing or voluntary. See supra pgs. 7–10. Under these circumstances, the Court cannot excuse Maldonado's failure to exhaust administrative remedies.

\* \* \*

Because Maldonado cannot establish the exhaustion elements of 8 U.S.C. § 1326(d)(1) and (d)(2), he cannot establish entitlement to dismissal of his indictment on the basis of flaws in his underlying deportation order.

### III.    Jurisdiction to Enter Deportation Order

Maldonado makes one further argument, different in kind. According to Maldonado, the Immigration Judge lacked jurisdiction to enter a deportation order against him because his initial Notice to Appear lacked a time and date at which Maldonado was supposed to appear. Maldonado argues that this error rendered his deportation proceedings a legal nullity. (Def. Br. 13–16.)

In Pereira v. Sessions, 138 S. Ct. 2105 (2018), the Supreme Court was presented with a question about what the Government must do to stop the clock on the accrual of "continuous presence in the United States" which, after ten years, makes an alien eligible for "cancellation of removal." Id. at 2109 (citing 8 U.S.C. § 1229b(b)(1)). Under § 1229b(d)(1)(A)—the "stop-time rule"—the Government must serve "a notice to appear under section 1229(a) of this title" to stop

the clock on this ten-year period. Section 1229(a) defines "notice to appear" as a document including certain information, including "the time and place at which the proceedings will be held." Id. § 1229(a)(1)(G)(i). The Supreme Court addressed a "narrow question": "If the Government serves a noncitizen with a document that is labeled 'notice to appear,' but the document fails to specify either the time or place of the removal proceedings, does it trigger the stop-time rule?" Pereira, 138 S. Ct. 2210. It continued: "The answer is as obvious as it seems: No." Id.

Maldonado seizes upon Periera and an arguably analogous portion of the immigration regulations. 8 U.S.C. § 1229a grants the Attorney General authority to conduct removal proceedings and § 1103(g)(2) grants him further authority to establish regulations that he "determines to be necessary for carrying out" his statutory duties. Relevant here, one regulation reads, "[j]urisdiction vests, and proceedings before an Immigration Judge commence, when a charging document is filed with the Immigration Court by the Service." 8 C.F.R. § 1003.14(a). "Charging document means the written instrument which initiates a proceeding before an Immigration Judge. . . . For proceedings initiated after April 1, 1997, these documents include a Notice to Appear . . . ." Id. § 1003.13.

Maldonado's argument is as follows: Periera held that a "notice to appear" must include both the date and the time of the hearing. 8 C.F.R. § 1003.14(a) states that the immigration tribunal's "[j]urisdiction vests" when a "Notice to Appear" is filed. Maldonado's Notice to Appear did not include the date or the time of the hearing. Therefore, the jurisdiction of the immigration tribunal never vested and his deportation order is a legal nullity. For a number of reasons, the Court finds that Maldonado's challenge is meritless.

26

### A. Waiver

The simplest reason Maldonado's argument fails is that it has been waived. Maldonado initialed next to a line that read: "I admit that all of the factual allegations contained in the NTA are true and correct. I also agree that I am inadmissible or deportable and will be removed from the United States based on the charge(s) on the NTA." As the Seventh Circuit has held, "[w]hen a petitioner expressly concedes his removability as charged in the NTA, he waives any objection to the IJ's finding of removability, including the argument that the IJ lacked jurisdiction to find him removable." Qureshi v. Gonzales, 442 F.3d 985, 990 (7th Cir. 2006); see also Chambers v. Mukasey, 520 F.3d 445, 450 (5th Cir. 2008); Lukarov v. Gonzales, 159 F. App'x 24, 26 (10th Cir. 2005); but see Nolasco, 637 F.3d at 162 (recognizing that this is an open question in the Second Circuit).

Several district courts have rejected this line of cases based on the general principle that "subject-matter jurisdiction c[an]not be waived." See, e.g., United States v. Zapata-Cortinas, No. 18-CR-343 (OLG), 2018 WL 4770868, at *4 (W.D. Tex. Oct. 2, 2018), superseded by --- F. Supp. 3d ---, 2018 WL 6061076 (W.D. Tex. Nov. 20, 2018). This Court, however, agrees that the requirement to file a Notice to Appear "is analogous to service of process in federal court, and is an indication that the [jurisdictional] regulation [8 C.F.R. § 1003.14(a)] is addressing the immigration court's acquisition of personal jurisdiction over the person for purposes of a removal proceeding." See United States v. Larios-Ajoulat, No. 18-10076-JWB, 2018 WL 5013522, at *6 n.4 (D. Kan. Oct. 15, 2018). Service of process, of course, is generally waivable. Santos v. State Farm Fire and Cas. Co., 902 F.2d 1092, 1095 (2d Cir. 1990); see also Fed. R. Civ. P. 12(b)(5), (h). And several district courts have found waiver in contexts identical to those presented here. United States v. Ordonez, 328 F. Supp. 3d 479, 500 (D. Md. 2018); United States v. Morales-Hernandez,

27

No. CR-18-365-TUC-RCC (JR), 2018 WL 4492377, at *1 (D. Ariz. Sep. 18, 2018); <u>United States v. Munoz-Alvarado</u>, No. CR-18-171-C, 2018 WL 4762134, at *1 (W.D. Ok. Oct. 2, 2018); <u>United States v. Chavez</u>, 2:17-CR-40106-01-HLT, 2018 WL 6079513, at *6 (D. Kan. Nov. 21, 2018). The case for waiver is even stronger where a defendant's challenge to jurisdiction comes in a collateral attack rather than on direct review. <u>United States v. Zapata</u>-Cortinas, No. SA-CR-343-OLG, 2018 WL 6061076, at *9 (W.D. Tex. Nov. 20, 2018) ("However, although it is true that want of jurisdiction is generally not waivable during the underlying proceedings and immediate appeal, the Supreme Court has made clear that challenges to subject-matter jurisdiction may be waived for the purposes of a subsequent collateral attack."). Therefore, the Court finds that Maldonado waived his argument that the Immigration Judge lacked jurisdiction over him by conceding removability.

### *B. 8 U.S.C § 1229(a) "notice to appear" v. 8 C.F.R. § 1003.15 "Notice to Appear"*

Even if Maldonado had not waived his argument about the Immigration Judge's jurisdiction, it would fail because it overlooks a fundamental difference between an 8 C.F.R. § 1003.15 "Notice to Appear" and an 8 U.S.C. § 1229a "notice to appear."

In <u>Pereira</u>, the Supreme Court analyzed the stop-time rule, 8 U.S.C. § 1229b(d)(1)(A), which could be triggered only after service of "a notice to appear under section 1229(a) of this title." Therefore, the Supreme Court held, the stop-time rule was necessarily dependent on the statutory definition of "notice to appear," which contained the requirement that such notice include "the time and place at which the proceedings will be held." 8 U.S.C. § 1229(a)(1)(G)(i). In contrast, 8 C.F.R. § 1003.15 provides its own definition of what constitutes a "Notice to Appear" for the purpose of vesting the jurisdiction of an immigration tribunal. That definition does not include a requirement that "the time and place at which the proceedings will be held" must be

disclosed. See 8 C.F.R. § 1003.15(b)–(c). Further, the jurisdictional regulation does not cross-reference the 8 U.S.C. § 1229(a) definition of "notice to appear." Cf. Karingithi v. Whitaker, --- F.3d ---, 2019 WL 333335, at *3 (9th Cir. 2019) ("There is no 'glue' to bind § 1229(a) and the jurisdictional regulations: the regulations do not reference § 1229(a), which itself makes no mention of the IJ's jurisdiction. Pereira's definition of a 'notice to appear under section 1229(a)' does not govern the meaning of 'notice to appear' under an unrelated regulatory provision."); see also Hernandez-Perez v. Whitaker, 911 F.3d 305, 314 (6th Cir. 2018) ("We agree with the Board that Pereira is an imperfect fit in the jurisdictional context and it does not mandate a different conclusion than the one already reached by this court and all our sister circuits.").

Because the jurisdiction of the immigration tribunal is contingent on the service of a regulatory Notice to Appear, not a statutory notice to appear, the Court holds that a Notice to Appear that meets the specifications of 8 C.F.R. § 1003.15(b) and (c) is sufficient to confer jurisdiction on an immigration tribunal. Because Maldonado does not contest that the Notice to Appear served on him met this regulatory definition, his argument that the immigration tribunal lacked jurisdiction to enter a deportation order against him fails. See United States v. Romero-Caceres, --- F. Supp. 3d ---, 2018 WL 6059381, at *7 (E.D. Va. Nov. 19, 2018); see also United States v. Romero-Colindres, No. 1:18-cr-00415, 2018 WL 5084877, at *2 (N.D. Ohio Oct. 18, 2018); United States v. Ramirez, No. 3:18-cr-26, 2018 WL 6037540, at *4 (W.D. Va. Nov. 16, 2018); United States v. Vigniero-Mejia, No. 18-cr-133-01-JL, 2018 WL 6050905, at *2–3 (D. N.H. Nov. 19, 2018).

## C. *Power of the District Court*

Finally, Maldonado's argument misconceives his power to collaterally attack his deportation order. Maldonado fashions his argument about the Immigration Judge's jurisdiction

29

as outside the scope of § 1326(d) review and therefore not subject to that section's heightened constraints. (Def. Br. 16.) The Government disagrees and argues that Maldonado must still prove exhaustion of administrative remedies, deprivation of judicial review, fundamental error, and prejudice. (Gov. Br. 33.) In other words, the Government contends that the Pereira argument alleges another "fundamental procedural error" subject to the same constraints as the arguments rejected above. The Government has the better of the arguments.

Section 1326(d), titled "Limitation on collateral attack on underlying deportation order," is the exclusive channel through which a defendant can challenge an underlying removal order. That section reads: "In a criminal proceeding under this section, an alien <u>may not challenge the validity of the deportation order described in subsection (a)(1) or subsection (b) unless</u> the alien demonstrates that" he has exhausted administrative remedies, been deprived of judicial review, and been subjected to a fundamentally unfair order. 8 U.S.C. § 1326(d) (emphasis added). Section 1326(d) could not be clearer—in order to challenge a prior deportation order, a defendant must satisfy § 1326(d)'s prerequisites. <u>See also Larois-Ajualat</u>, 2018 WL 5013522, at *7.

Maldonado cannot avoid the additional constraints imposed on a defendant's right to collaterally attack a deportation order imposed by § 1326(d). Maldonado did not exhaust his administrative remedies, § 1326(d)(1), nor was he deprived of the opportunity to seek judicial review, § 1326(d)(2). And because Maldonado could not—and, indeed, has not tried to—show that he was prejudiced by the lack of date and time on his Notice to Appear, the Court has a third independent reason to deny his motion. <u>Cf. id.</u> at *6 ("As the Supreme Court indicated in <u>Pereira</u>, the failure of a notice to appear to specify the date and time of a removal hearing could prejudice an alien by causing him to miss a hearing, by depriving him of the time or incentive to find counsel, or by depriving the alien (or counsel) of time to prepare for the hearing."); <u>United States v.</u>

Fernandez, --- F. Supp. 3d ---, 2018 WL 5929632, at *7 (E.D. Va. Nov. 13, 2018) (denying motion to dismiss indictment despite "grave due process concerns" stemming from deportation "entered in the defendant's absence and without the defendant's knowledge" because "[n]onetheless, . . . defendant has not made the required particularized showing of prejudice.").

## CONCLUSION

Because Maldonado has not shown that his immigration proceedings were "fundamentally unfair" under 8 U.S.C. § 1326(d) or that the immigration tribunal lacked jurisdiction to deport him under 8 C.F.R. § 1003.14(a), his motion to dismiss the indictment is DENIED. The next status conference in this case shall take place on February 13, 2019 at 10:30 AM in Courtroom 10D South.

SO ORDERED.

Dated: February 11, 2019
      Brooklyn, New York

                                           s/Carol Bagley Amon

                                       Carol Bagley Amon
                                       United States District Judge